UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                          :

ALEX SPIZZ,                           :

                            Plaintiff,      :

                                            :

                   v.                       :

                                            :

UNITED STATES OF AMERICA,      :        15 Civ. 2361 (KPF)

                                          :

      Defendant/Third-Party Plaintiff,  :      OPINION AND ORDER

                                          :

                   v.                       :

                                          :

MARTIN TODTMAN,                  :

                        Third-Party :

                        Defendant. :

                                          :

------------------------------------------------------X

KATHERINE POLK FAILLA, District Judge:

       This case arises from financial decisions made by a law firm during an extended period of financial distress, at least part of which was attributable to larcenous conduct from within. After the firm failed to remit taxes it was holding in trust for the Government, the Internal Revenue Service (the "IRS") assessed penalties against the firm's shareholders for the amounts owed. One such shareholder, Alex Spizz, initiated this action to seek an abatement of the penalties; the Government then counterclaimed against Spizz and filed a third-party complaint against the two other shareholders, Martin Todtman and Barton Nachamie, seeking judgment against them in the amount of the outstanding tax liabilities. Before the Court is the Government's motion for

summary judgment with respect to its claims against Spizz and Todtman.  For

the reasons that follow, the Court grants the motion.

## BACKGROUND[1]

### A.  Factual History

### 1.  The Law Firm and Its Failure to Pay Trust Fund Taxes

From 2009 through mid-September 2012, Spizz, Todtman, and

Nachamie were the named shareholders of the law firm Todtman, Nachamie,

Spizz & Johns, P.C., in which they each held a one-third interest.  (Spizz 56.1

Opp. ¶ 1).  In mid-September 2012, Todtman left the firm, which then became

Nachamie Spizz Cohen & Serchuk, P.C., with Spizz and Nachamie becoming

---

[1]  The Court draws the facts in this Opinion from the parties' submissions in connection with the motion for summary judgment, including the Government's Local Rule 56.1 Statement ("Gov't 56.1" (Dkt. #63)), Plaintiff Spizz's Opposition to the Government's Local Rule 56.1 Statement ("Spizz 56.1 Opp." (Dkt. #71)); Third-Party Defendant Todtman's Opposition to the Government's Local Rule 56.1 Statement ("Todtman 56.1 Opp." (Dkt. #76)); the deposition transcripts of Spizz ("Spizz Dep." (Dkt. #64-1)), Todtman ("Todtman Dep." (Dkt. #72-8)), Laurie Newman ("Newman Dep." (Dkt. #72-1)), and Mitchell Lynn ("Lynn Dep." (Dkt. #72-2)); the declarations of Spizz ("Spizz Decl." (Dkt. #72-7)) and Irene Ck Tong ("Tong Decl." (Dkt. #65)), and related exhibits ("Tong Decl. Ex. [ ]"); and records from the firm's operating account ("Operating Account June 2010" (Dkt. #72-12)) and payroll account ("Payroll Account June 2010" (Dkt. #80-1)) at Sterling National Bank for the period from June 1, 2010, through June 30, 2010.  For convenience, the Court will refer to the Government's memorandum of law in support of summary judgment as "Gov't Br." (Dkt. #62), Spizz's memorandum of law in opposition to summary judgment as "Spizz Br." (Dkt. #70), and Todtman's memorandum of law in opposition to summary judgment as "Todtman Br." (Dkt. #75).

Citations to a party's Rule 56.1 Statement incorporate by reference the documents and testimony cited therein.  Where facts stated in a party's Rule 56.1 Statement are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true.  *See* S.D.N.Y. Local Rule 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a corresponding numbered paragraph in the statement required to be served by the opposing party."); *id.* at 56.1(d) ("Each statement by the movant or opponent ... controverting any statement of material fact[ ] must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c).").

equal shareholders. (*Id.* at ¶ 14). Nachamie then left the firm in or about December 2013, at which point the firm became Spizz Cohen & Serchuk, P.C., with Spizz becoming sole shareholder. (*Id.* at ¶ 15). The firm ceased operations in April 2015. (*Id.* at ¶ 16).

The firm employed between 28 and 33 employees from 2009 through 2012, and hired a payroll service that calculated each employee's net pay and prepared payroll checks for the firm. (Spizz 56.1 Opp. ¶¶ 2-3). The payroll service also calculated the firm's tax obligations, including its trust fund taxes, i.e., the federal income, social security, and Medicare taxes that the firm was required to withhold from its employees and pay to the IRS each pay period. (*Id.* at ¶ 4). The firm failed to pay trust fund taxes in a timely manner to the IRS for the following quarterly tax periods in the following amounts:

- For the period ending June 30, 2009, $221,671.30;
- For the period ending September 30, 2009, $180,379.87;
- For the period ending December 31, 2009, $265,147.23;
- For the period ending March 31, 2010, $189,998.67;
- For the period ending June 30, 2010, $122,685.01;
- For the period ending December 31, 2011, $216,040.11; and
- For the period ending March 31, 2012, $205,669.11.

(*Id.* at ¶¶ 6-13).[2] The issue in this litigation is whether the Government is entitled to hold Spizz or Todtman personally liable for the portions of these amounts that remain outstanding.

---

[2]     Todtman objects to these amounts, asserting that the declaration of IRS Revenue Officer Irene Ck Tong, on which the Government relies to establish these numbers,

## 2. Todtman's Role at the Firm

By way of background, Todtman established the law firm that eventually became Todtman, Nachamie, Spizz & Johns, P.C. in the mid-1970s. (*See* Todtman Dep. 12:10-13:21). From 2009 through mid-September 2012, Todtman was a shareholder at the firm, controlling one-third of its voting stock, and an officer holding the title of President. (Todtman 56.1 Opp. ¶¶ 17-18). Although Todtman now contends that he "was denied independent access to the firm's checkbooks and check authorization from 2008" (*id.* at ¶ 110), the record overwhelmingly proves the contrary. For starters, other members and colleagues of the firm recognized Todtman as having an outsized role in the firm's management. Mitchell Lynn, an outside accountant for the firm who prepared the firm's annual tax return, testified during a deposition that Todtman was "the managing officer of the firm." (Lynn Dep. 28:5-6). Indeed, Todtman himself testified that he "started th[e] firm," and "[i]f it wasn't for Todtman, there wouldn't have been a firm." (Todtman Dep. 148:17-18, 160:18-19). Spizz's testimony likewise emphasized that as President, Todtman "held himself out as, and everybody [who ever] worked for the firm knew that

---

contains different amounts and, therefore, that "one or both of the amounts are false." (Todtman Br. 4). This assertion misperceives the information contained in the Tong Declaration. The amounts listed in the text are the amounts the law firm failed to pay for those periods. (*See* Tong Decl. ¶¶ 18-24). The Tong Declaration also specifies the amounts the IRS assessed as penalties against both Spizz and Todtman and the remaining liability as of March 27, 2017. (*Id.* at ¶ 31).

Marty Todtman, who's the first name on the letterhead, was the managing Partner. He was the Todtman firm." (Spizz Dep. 29:5-12).[3]

Documentary evidence also underscored Todtman's managerial role. In September 2012, on behalf of the firm, Todtman completed an IRS form entitled, "Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Taxes." (Tong. Decl., Ex. 14). On the form, Todtman checked boxes indicating that he performed the following duties at the firm from 1978 through 2010:

- "Determine[d] financial policy for the business";
- "Direct[ed] or authorize[d] payments of bills/creditors";
- "Open[ed] or close[ed] bank accounts for the business";
- "Guarantee[d] or co-sign[ed] loans";
- "Sign[ed] or counter-sign[ed] checks";
- "Authoriz[ed] or ma[de] Federal Tax Deposits";
- "Prepare[d], review[ed], sign[ed], transmit[ted] payroll tax returns"; and
- "Hir[ed]/fir[ed]" employees.

(*Id.*). He also signed the firm's corporate income tax return for 2009, and the firm's quarterly federal tax return for the third and fourth quarters of 2009 and the first quarter of 2010. (*See id.*, Ex. 4, 10, 11; Todtman 56.1 Opp. ¶¶ 26-27).

In the course of discharging these responsibilities, Todtman made consequential decisions concerning the firm's tax payments. Outside accountant Lynn testified that in 2009, he discovered that the firm was failing

---

[3]     As Todtman points out, the firm was not structured as a partnership but a corporation. (*See* Todtman 56.1 Opp. ¶ 108). Nevertheless, the Court interprets references to Todtman as "managing partner" of the firm in a functional rather than formal sense.

to pay trust fund taxes.  (Lynn Dep. 22:10-23).  Upon discovering the underpayment, Lynn brought the issue solely to Todtman's attention, who responded "that he [Todtman] could not pay his taxes and pay the bills of the firm, so he was making a hard choice."  (*Id.* at 23:5-17; *see id.* at 24:14-23).  Laurie Newman, the firm's former bookkeeper and office manager, testified similarly that when she discussed the issue with Todtman, rather than providing an explanation, he replied, "fuck them."  (Newman Dep. 77:4-20; *see id.* at 14:2-18:15).

Todtman denies that either of these conversations occurred.  (Todtman 56.1 Opp. ¶¶ 30-31).  However, as discussed more fully below, once Spizz discovered that the firm had fallen behind on tax payments, he and Nachamie identified Todtman as the source of the problem and revoked his managerial authority.

### 3.   Spizz's Role at the Firm

From 2009 through mid-September 2012, Spizz was a shareholder at the firm, controlling one-third of the firm's voting stock, and was an officer with the title of Vice President.  (Spizz 56.1 Opp. ¶¶ 33-35).  During his deposition, Spizz testified that as a small business, the shareholders ran the firm "very informally," but if any "major decisions had to take place, [they] would meet, and ... generally agree on something."  (Spizz Dep. 37:2-10).

Like Todtman, Spizz's submissions in this case bespeak a desire to distance himself from any awareness of the firm's financial difficulties from 2009 to its 2015 demise.  In this regard, Spizz maintains that prior to June

6

2010, "his primary role at the Firm was practicing law." (Spizz 56.1 Opp. ¶ 36). At least as early as June 2010, however, Spizz was involved with major financial decisions at the firm, including paying creditors and trust fund taxes. (*Id.* at ¶ 35). Spizz also admits to participating in hiring and compensation decisions at the firm, but maintains that before June 2010, Todtman had authority to hire and fire employees and determine attorney compensation levels without the approval of other shareholders. (*See id.* at ¶¶ 36-38; Spizz Dep. 147:22-148:3; *see also* Spizz Decl. ¶ 5 ("[P]rior to June of 2010, Todtman was the President and Managing Partner of the firm, and the person who alone was responsible for … running the day to day operations of the firm.")).

Spizz acknowledges that he had authority to sign checks from the firm's operating and payroll accounts; however, he asserts that before June 2010, he only did so upon Todtman's authorization. (Spizz 56.1 Opp. ¶¶ 38-39). From at least 2009 until the firm closed in April 2015, Spizz was authorized to, and did in fact, guarantee loans on behalf of the firm. (*Id.* at ¶ 40). Spizz also had authority to review and sign the firm's corporate tax returns and quarterly tax returns, and he signed the firm's quarterly tax return for the second quarter of 2010. (*Id.* at ¶¶ 41-42).

On or before June 10, 2010, Spizz discovered that the firm had failed to pay the trust fund taxes it had been withholding. (Spizz 56.1 Opp. ¶ 44). Before that date, according to Spizz, Todtman had directed a tax lawyer at the firm, Robert Tolz, to prepare an Offer in Compromise to present to the IRS in an effort to settle the firm's tax liabilities. (*Id.* at ¶ 78). While preparing the

Offer in Compromise, Tolz conferred only with Todtman and Nachamie. (*Id.* at ¶ 80). Tolz then approached Spizz to request his signature on the Offer in Compromise, at which point Spizz learned of the amounts owed. (*Id.* at ¶¶ 78-81; Spizz Dep. 86:4-22). Spizz then confronted Nachamie and told him that he (Spizz) would only remain at the firm if Todtman no longer managed the firm's finances. (*See* Spizz 56.1 Opp. ¶¶ 81-82; Spizz Dep. 87:13-89:3). Soon thereafter (by June 14 according to Spizz and June 16 according to the Government), Spizz and Nachamie revoked Todtman's managerial responsibilities. (Spizz 56.1 Opp. ¶ 45).[4]

After revoking Todtman's management authority, Spizz and Nachamie began managing the firm's finances. (Spizz 56.1 Opp. ¶¶ 48-49). Spizz initially assumed at least some responsibility for these tasks, but claims to have passed these duties on to Nachamie around mid-2011. (*See id.* at ¶¶ 48, 84 ("Nachamie assum[ed] management responsibilities in or about the middle of 2011[.]"); *see also* Spizz Decl. ¶ 14 ("[B]eginning sometime in early to mid-2011 Nachamie began to assume responsibility for the Firm's finances.")). As Spizz explained, because of the demands of his litigation practice, he could not devote sufficient time to tend to the firm's finances, while Nachamie's practice allowed him to oversee such matters. (*See* Spizz Dep. 92:18-93:23, 133:16-134:4).

---

[4]     Todtman adds that this demotion was in addition to his previous loss of access to and authority over the firm's checkbooks. (*See* Todtman 56.1 Opp. ¶ 45).

Spizz claims that on June 10, 2010, when he learned from Tolz of the firm's trust fund tax liabilities, the firm lacked sufficient unencumbered assets to pay the outstanding amounts. (Spizz 56.1 Opp. ¶ 76). In particular, Spizz contends that Sterling National Bank held a lien against all of the firm's assets, and he points out that on that date, the firm's operating account carried an ending balance of negative $20,314.16. (*Id.* at ¶¶ 77, 79; *see also* Operating Account June 2010). Yet Spizz fails to mention that the account began that day with a positive balance of $63,762.83. (Operating Account June 2010).

Although this chapter in the firm's history began with an effort by firm management (i.e., Spizz and Nachamie) to stay current with respect to the firm's tax liabilities, the transition of financial responsibility to Nachamie brought with it a relapse into tax debt. (Spizz 56.1 Opp. ¶¶ 84-89). During this period, the firm paid trust fund taxes for the third and fourth quarters of 2010 and for the first, second, and third quarters of 2011, but failed to pay the full amount of trust fund taxes for the fourth quarter of 2011 and first quarter of 2012. (*See id.* at ¶ 59).

According to Spizz, he learned on April 13, 2012, that the firm had not fully paid its trust fund taxes for those latter periods, after he was copied on an email from the firm's accountant to Nachamie, in which the accountant announced that he would no longer serve the firm because of its failure to pay taxes. (Spizz 56.1 Opp. ¶¶ 61, 89). Spizz again reclaimed responsibility for the firm's finances and obtained an affidavit from Nachamie stating that he (Nachamie) was responsible for the firm's trust fund tax obligations for the

2011 and 2012 quarters during which the firm failed to make complete payments to the IRS. (*Id.* at ¶¶ 62, 94).

For this period, too, Spizz makes statements concerning the firm's ability to pay its debts. Of note, Spizz claims that on April 13, 2012, the firm lacked sufficient unencumbered assets to pay overdue taxes: Its operating account was overdrawn with a negative balance of $131,332.82, and Sterling National Bank continued to hold a lien on the firm's assets. (Spizz 56.1 Opp. ¶¶ 91-93). Also in April 2012, the firm restructured a preexisting $500,000 loan with Sterling National Bank after defaulting on the loan. (*Id.* at ¶ 63). Nevertheless, the firm made payments under an Offer in Compromise that it submitted to the IRS, along with payments to other creditors. (*Id.* at ¶ 54).[5] The non-IRS payments included compensation to firm shareholders, state taxes, employee salaries and benefits, rent, insurance, professional dues, and subscriptions. (*Id.* at ¶¶ 55-58). Spizz contends that many of these payments were necessary to support the firm's continued operations and, in turn, payments to the IRS under the Offer in Compromise. (*Id.* at ¶ 58).

---

[5]     Spizz's Rule 56.1 Statement is unclear as to whether the IRS ever approved the firm's Offer in Compromise. (*See, e.g.*, Spizz 56.1 Opp. ¶¶ 83 ("After the Firm submitted the [Offer in Compromise] to the IRS, the Firm made substantial regular payments to the IRS *pursuant to the proposal* set forth in the [Offer in Compromise]." (emphasis added)), 107 ("Because Mr. Spizz understood that the Firm had made an [Offer in Compromise] *that was under consideration by the IRS* and that the Firm was making regular substantial payments to the IRS, at all times after June 10, 2010, he reasonably believed that the Firm was addressing its back payroll tax problem." (emphasis added))).

### 4. The Discovery of Nachamie's Malfeasance

According to Spizz, he came to learn that the firm's financial difficulties were attributable to more than simple downturns in business. In or about December 2013, Spizz noticed an inconsistency in one of the firm's client escrow accounts; further investigation, with the assistance of a forensic accountant, revealed that Nachamie had looted almost $1 million from the firm's accounts. (Spizz 56.1 Opp. ¶ 95). After Spizz reported Nachamie's misconduct, law enforcement authorities investigated the matter; Nachamie was eventually convicted of grand larceny and falsifying business records, sentenced to a term of imprisonment, disbarred, and ordered to pay restitution amounting to $430,556.00. (*Id.* at ¶ 97).

Nachamie thereafter declared bankruptcy, during which the judgment the firm had obtained against him was found to be non-dischargeable. (Spizz 56.1 Opp. ¶¶ 99-100). During the bankruptcy proceedings, the IRS accepted an Offer in Compromise to settle Nachamie's personal tax liabilities as well as the trust fund penalties against him arising out of the same facts as those that spurred the instant litigation. (*Id.* at ¶ 101). This agreement resulted in Nachamie paying $185,646.00 of the over $1.6 million he owed in personal income tax and trust fund penalties. (*Id.* at ¶ 102).

### B. Procedural History

#### 1. The Government's Tax Penalty Assessments

##### a. As to Spizz

On or about March 26, 2012, the IRS assessed trust fund recovery penalties against Spizz under 26 U.S.C. § 6672 in the amount of trust fund taxes owed for the quarterly tax periods ending June 30, 2009, September 30, 2009, December 31, 2009, March 31, 2010, and June 30, 2010. (Spizz 56.1 Opp. ¶ 70). On or about May 19, 2014, the IRS assessed additional trust fund recovery penalties against Spizz for the quarterly tax periods ending December 31, 2011, and March 31, 2012. (*Id.* at ¶ 73). The Government contends that of these penalties, Spizz continues to owe a total of $698,893.31, consisting of $585,593.46 for the 2009 and 2010 tax periods, and $113,299.85 for the 2011 and 2012 tax periods. (*Id.* at ¶ 74).[6]

##### b. As to Todtman

On or about May 21, 2012, the IRS assessed trust fund recovery penalties against Todtman under § 6672 in the amount of trust fund taxes

---

[6] Spizz contends that "some payments remitted by the Firm to be designated to the amount the Firm owed for the period ending March 31, 2012 were applied by [the] IRS to earlier payroll tax periods." (Spizz 56.1 Opp. ¶ 74). Spizz's declaration clarifies that he "do[es] not take issue with the amounts the Government claims," but "contend[s] that payments that were earmarked to be applied to the tax obligation for the first quarter of 2012 were misapplied to the second and fourth quarters of 2009." (Spizz Decl. ¶ 22). The Government concedes that Spizz directed revenue to pay down the trust fund taxes, but maintains that this effort "correspondingly reduced the amount of the trust fund recovery penalty assessments against Spizz and Todtman." (Gov't Br. 9 n.2).

In any event, because the Court grants summary judgment against Spizz and Todtman for the entirety of the claimed amounts, and because the Government assessed penalties against Spizz for tax periods in both 2009 and 2012, the challenged allocation of payments is immaterial to Spizz's liability.

owed for the quarterly tax periods ending on June 30, 2009, September 30, 2009, December 31, 2009, March 31, 2010, and June 30, 2010. (Todtman 56.1 Opp. ¶ 71). On or about August 26, 2013, the IRS assessed additional trust fund recovery penalties against Todtman for the quarterly tax periods ending on December 31, 2011, and March 31, 2012. (*Id.* at ¶ 72). The Government contends that of these penalties, Todtman continues to owe a total of $701,374.76, consisting of $581,213.09 for the 2009 and 2010 tax periods, and $120,161.67 for the 2011 and 2012 tax periods. (*Id.* at ¶ 75).[7]

## 2. The Instant Litigation

On March 30, 2015, Spizz filed a complaint seeking an abatement of the penalties the IRS assessed against him. (Dkt. #1). On November 20, 2015, Spizz filed an amended complaint (Dkt. #22), which the Government answered on December 18, 2015, including a counterclaim to obtain judgment on the outstanding penalty amounts against Spizz (Dkt. #23). On March 21, 2016, the Government filed a third-party complaint against Todtman and Nachamie seeking to obtain a judgment on the outstanding tax penalties assessed against them. (Dkt. #29). On April 28, 2016, the Government voluntarily dismissed its

---

[7]     In his opposition to the Government's statement of undisputed material facts, Todtman argues that the assessments against him "were devoid of predicate notice pursuant to [26 U.S.C.] § 6672(b), and thus were not duly assessed." (Todtman 56.1 Opp. ¶¶ 71-72, 75). Yet Todtman fails to expand on this legal argument in his memorandum of law, and the Court therefore will not consider it. *See, e.g.*, *Neth. Ins. Co.* v. *Selective Ins. Co. of Am.*, No. 14 Civ. 7132 (KPF), 2016 WL 866348, at *7 (S.D.N.Y. Mar. 3, 2016) (concluding that a party abandoned arguments that it failed to discuss in its response brief); *cf. Jackson* v. *Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014) (noting that a counseled response to a motion for summary judgment that makes some — but not all — arguments available generally "reflects a decision by [the] party's attorney to pursue some claims or defenses and to abandon others").

claims against Nachamie after he entered an Offer in Compromise with the Government to resolve the trust fund penalties assessed against him. (*See* Dkt. #33; Gov't Br. 9). On May 18, 2016, Todtman answered the third-party complaint against him. (Dkt. #35).

On March 3, 2017, the Government filed the instant motion for summary judgment. (Dkt. #61-65). The motion seeks "a judgment against Spizz and Todtman, jointly and severally, for the amount due for 2009 and 2010, and a judgment against Spizz for the amount due for 2011 and 2012." (Gov't Br. 9). The Government calculates these judgments, including penalties and interest through March 27, 2017, to be $698,893.31 against Spizz and $582,213.09 against Todtman. (*See* Gov't Br. 21; Gov't 56.1 ¶¶ 74-75).[8] On April 17, 2017, Spizz and Todtman filed papers opposing the motion. (Dkt. #70-72, 74-76). With the filing of the Government's reply brief on May 5, 2017 (Dkt. #79-80), the motion is now ripe for disposition.

## DISCUSSION

### A.     Applicable Law

#### 1.      Summary Judgment in Tax Dispute Cases

Rule 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see*

---

[8]     The Government does not seek to recover the tax liabilities from 2011 and 2012 against Todtman. (Gov't 56.1 ¶ 75 n.6). The Government's brief seeks a judgment against Spizz amounting to $698,893.51; this figure may be overstated by $0.20, inasmuch as the sum of Spizz's tax liability as presented in the Government's Rule 56.1 Statement is $698,893.31. (*See id.* at ¶ 74).

*also Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 631 n.12 (2d Cir. 2016) (citation omitted). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003) (citation omitted).

In the specific context of tax disputes under 26 U.S.C. § 6672, summary judgment in favor of the Government is appropriate if there are no genuine disputes "as to the assessed individual's control of company funds and decisionmaking authority, his or her knowledge of the deflection of company funds to payees other than the IRS, or the existence or reasonableness of his or her belief that the taxes were, in fact, being paid." *Winter* v. *United States*, 196 F.3d 339, 346 (2d Cir. 1999) (citing *United States* v. *Rem*, 38 F.3d 634, 644 (2d Cir. 1994)). Significantly, however, it is the individual challenging the Government's tax assessment under § 6672 who bears the burden of disproving the propriety of the Government's assessment. *See Fiataruolo* v. *United States*, 8 F.3d 930, 938 (2d Cir. 1993). This alteration to the traditional allocation of burdens has consequences for the summary judgment analysis:

The burden of persuasion at trial is now on the *non-moving* party, and thus the moving party — here, the Government — "may satisfy [its] burden of production under Rule 56 in either of two ways: [i] by submitting evidence that negates an essential element of the non-moving party's claim, or [ii] by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*, 875 F.3d 107, 2017 WL 5162690, at *4 (2d Cir. 2017).

## 2. Liability Under 26 U.S.C. § 6672

The Internal Revenue Code requires employers to withhold certain taxes in "a special fund in trust for the United States," and IRS regulations require the employer to remit such trust fund taxes to the IRS on a quarterly basis. 26 U.S.C. § 7501(a); *see Winter*, 796 F.3d at 344 (citing §§ 3102(a), 3402, 7501(a); 26 C.F.R. §§ 31.6011(a)-1, -4)). "An employer who fails to remit withheld sums to the government is liable for the taxes that should have been paid." *Fiataruolo*, 8 F.3d at 938. Specifically, § 6672(a) of the Code provides that

> [a]ny person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a).

The Second Circuit has described this provision as "a vital collection tool that cuts through an employer's organizational structure and allows the IRS to impose liability directly and individually on those persons responsible for the tax delinquency." *Fiataruolo*, 8 F.3d at 938 (citing *Godfrey* v. *United States,* 748 F.2d 1568, 1574 (Fed. Cir. 1984)). Although the statute is "harsh," courts have acknowledged "that the danger against which it is directed — that of failing to pay over money withheld from employees until it is too late, because the company has gone broke — is an acute one against which, perhaps, only harsh measures are availing." *Carter* v. *United States*, 717 F. Supp. 188, 191 (S.D.N.Y. 1989) (quoting *Wright* v. *United States*, 809 F.2d 425, 428 (7th Cir. 1987)).

The Government may recover unpaid taxes from an individual under § 6672 if, first, the person against whom the Government seeks to recover is "a person responsible for the collection and payment of withholding taxes," and second, "the individual's failure to comply with the statute [is] willful." *Hochstein* v. *United States*, 900 F.2d 543, 546 (2d Cir. 1990). As noted previously, "[t]he person against whom the IRS assesses a § 6672 tax penalty has the burden of disproving, by a preponderance of the evidence, the existence of one of these two elements." *Fiataruolo*, 8 F.3d at 938. Accordingly, the Court considers whether the Government has demonstrated as a matter of law that Spizz and Todtman would be unable to prove — and at this stage, unable to raise a genuine dispute of material fact — that (i) they were not responsible

for the collection and payment of the firm's trust fund taxes or (ii) they did not willfully fail to remit such taxes.

## B. Analysis

### 1. The Record Forecloses Todtman and Spizz from Arguing That They Were Not "Responsible Persons" for the Firm's Payment of Trust Fund Taxes

"In determining whether an individual is a 'responsible person' within the meaning of [§] 6672(a), '[t]he determinative question is whether the individual has significant control over the enterprise's finances.'" *Winter*, 196 F.3d at 345 (second alteration in original) (quoting *Rem*, 38 F.3d at 642). The issue turns on whether, given an individual's role within a company and authority over its financial operations, the individual could have prevented the tax delinquency. *See Fiataruolo*, 8 F.3d at 939; *O'Callaghan* v. *United States*, 943 F. Supp. 320, 324 (S.D.N.Y. 1996). Although such responsibility does not require "absolute authority," it does not encompass mere "technical authority or titular designation." *Fiataruolo*, 8 F.3d at 939.

In making this determination, courts look to whether an individual

> [i] is an officer or member of the board of directors, [ii] owns shares or possesses an entrepreneurial stake in the company, [iii] is active in the management of day-to-day affairs of the company, [iv] has the ability to hire and fire employees, [v] makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, [vi] exercises control over daily bank accounts and disbursement records, and [vii] has check-signing authority.

*Fiataruolo*, 8 F.3d at 939. "No single factor is dispositive in evaluating whether an individual has significant control; rather, the determination must be made

in light of the totality of the circumstances." *Winter*, 196 F.3d at 345.  As is relevant here, a company may have multiple responsible persons, and "delegation of responsibility will not relieve an otherwise responsible person of liability." *O'Callaghan*, 943 F. Supp. at 324.

### a. Todtman Was a Responsible Person

Viewed within this legal framework, the record eliminates any genuine dispute of fact as to whether Todtman was a responsible person under § 6672. Todtman not only founded the firm that eventually became Todtman, Nachamie, Spizz & Johns, P.C., but was also President and one-third owner of that firm for the periods for which the Government assessed tax penalties against him.  And even taking as true Todtman's assertion that he "was denied independent access to the firm's checkbooks and check authorization from 2008," he admits that "he could still sign checks when it was demanded of him by, or authorized by, the other partners."  (Todtman 56.1 Opp. ¶ 110).

As it happens, Todtman's current assertion that he required the other shareholders' approval to sign checks on the firm's behalf is undercut by his testimony that he would sign checks if other shareholders were unavailable. (*Compare* Todtman 56.1 Opp. ¶ 5 ("Todtman was denied independent access to the firm's checkbooks and check authorization from 2008, though he could still sign checks when it was demanded of him by, or authorized by, the other partners."), *with* Todtman Dep. 60:14-25 ("[I]f no one was in the office, if [Nachamie] was not in the office and [Spizz] was not available, and the bills or

checks had to be sent out, they would bring them in to me.")).[9]  The record as a

whole negates Todtman's claim that he was not a responsible party at the firm.

*See Fiataruolo*, 8 F.3d at 939 (A responsible party need not have "absolute

authority" or "the final word on which creditors are to be paid or how funds are

to be allocated.").

Indeed, Todtman's own admissions both during and before this litigation

support the Court's conclusion.  Todtman completed a tax form related to the

tax penalties at issue in which he admitted to satisfying nearly every factor

courts examine in determining responsibility for trust fund tax payments,

including — from 1978 through 2010 — determining the firm's financial policy,

paying bills and creditors, opening or closing bank accounts, guaranteeing

loans, signing checks, making federal tax deposits, submitting payroll tax

returns, and making employment decisions.  (Tong Decl., Ex. 14).  *See*

---

[9]     In deciding a motion for summary judgment, "a district court generally 'should not
weigh evidence or assess the credibility of witnesses.'"  *Rojas* v. *Roman Catholic Diocese
of Rochester*, 660 F.3d 98, 104 (2d Cir. 2011) (quoting *Hayes* v. *N.Y. City Dep't of Corr.*,
84 F.3d 614, 619 (2d Cir. 1996)).  But

> in the rare circumstance where the plaintiff relies almost exclusively on
> his own testimony, much of which is contradictory and incomplete, it will
> be impossible for a district court to determine whether "the jury could
> reasonably find for the plaintiff," and thus whether there are any "genuine"
> issues of material fact, without making some assessment of the plaintiff's
> account.

*Jeffreys* v. *City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citation omitted)
(quoting *Anderson*, 477 U.S. at 252).  In this rare setting, a court considering a
summary judgment motion may make credibility determinations.  *SEC* v. *Jankovic*,
No. 15 Civ. 1248 (KPF), 2017 WL 1067788, at *8 (S.D.N.Y. Mar. 21, 2017).  Even then,
the Second Circuit has cautioned that, "[i]f there is a plausible explanation for
discrepancies in a party's testimony, the court considering a summary judgment motion
should not disregard the later testimony because of an earlier account that was
ambiguous, confusing, or simply incomplete."  *Jeffreys*, 426 F.3d at 555 n.2 (emphasis
and citation omitted).  Instead, such credibility assessments are to be reserved for
"extraordinary cases, where the facts alleged are so contradictory that doubt is cast
upon their plausibility."  *Rojas*, 660 F.3d at 106 (citation and quotation marks omitted).

*Fiataruolo*, 8 F.3d at 939.  As Todtman stated during his deposition, "If it wasn't for Todtman, there wouldn't have been a firm."  (Todtman Dep. 148:17-18).  And this testimony comports with that of his coworkers and colleagues, who indicated that they viewed Todtman as the firm's manager and that they interacted primarily with Todtman upon discovering the firm's tax delinquencies.  (*See* Lynn Dep. 23:5-17; *see id.* at 24:14-23; Newman Dep. 77:4-20).  In short, Todtman would be unable to disprove at trial, and has not even raised a genuine dispute of fact, that he was a responsible person under § 6672(a).

### b.    Spizz Was a Responsible Person

Although Spizz may not have exercised his authority over the firm's finances to the same extent as Todtman, the Court's analysis is not so constrained that it can disregard the authority he did possess:  "The inquiry focuses on whether an individual *could have* exerted influence" to avoid tax delinquency, and "a person *need not … actually exercise authority* to be held a responsible party for the payment of withheld taxes."  *Fiataruolo*, 8 F.3d at 939 (emphases added).  Abundant evidence in the record proves this point.  Like Todtman, from 2009 through 2011, Spizz controlled one-third of the firm's shares, and during that period he was acting Vice President of the firm.  And he, along with Nachamie, exercised their managerial authority in June 2010, first by removing financial responsibility from Todtman and then by assuming that same responsibility.  This evinces, as was true all along, that Spizz held

more than mere "technical authority," and that he could have been more involved in the firm's financial decisions had he earlier so chosen.  *Id.*

Spizz argues that other shareholders at the firm were responsible persons during the relevant time period; Todtman controlled the firm's finances during the relevant tax quarters of 2009 through 2010, while Nachamie controlled the firm's finances during the relevant tax quarters of 2011 and 2012.  (*See* Spizz Br. 11-14).  But even taking these assertions as true, the control Spizz's colleagues exerted over the firm's finances would not and did not detract from the authority that he possessed as one-third owner and Vice President of the firm.  *See Fiataruolo*, 8 F.3d at 939 ("Significant control may be shared by several people within a company," and "[s]uch authority may not be delegated to others in order to avoid liability." (citations omitted)).

And while the Second Circuit has found triable issues of fact as to whether an individual was a responsible person in cases where the individual's title far outstripped his or her authority, those cases have no place in this analysis.  Spizz's efforts — and, perhaps more importantly, his ability — to oversee the firm's finances before and after discovering its tax liabilities distinguish this case from those involving persons with nominal titles.  *Cf. Winter*, 196 F.3d at 346 (finding triable issue of fact as to responsibility of individual who held "ownership interest, titles, and check-writing authority" "as a convenience to her husband"); *Rem*, 38 F.3d at 644 (finding triable issue of fact as to responsibility of individual who was officer and director of, and held 20% ownership in, company, where individual contended that his title "was

spurious, being merely a device to induce commercial or financial organizations to grant the company credit"). What Spizz overlooks are the many cases making plain that "[a] person may be a 'responsible person' without being *the most* responsible person." *Beeler* v. *United States*, 894 F. Supp 761, 770 (S.D.N.Y. 1995) (emphasis added) (citing *Hochstein*, 900 F.2d at 547). On this record, there can be no genuine dispute that Spizz was a responsible person.

Neither Todtman nor Spizz has filed a cross-motion for summary judgment; they are not asking the Court to find as a matter of law that they were not responsible persons, but rather are seeking only to have the issue resolved at trial. The record here renders their respective claims untenable for the reasons just described. The Court also pauses to observe that acceptance of arguments made by individuals in analogous positions — here, President and Vice President, and, along with Nachamie, the joint owners, of a law firm — would thwart the purpose of § 6672 by leaving the Government without recourse for a law firm's failure to remit trust fund taxes. *See Beeler*, 894 F. Supp. at 770 ("To give effect to the revenue collection purpose of the statute, the courts have taken a 'broad view' of who qualifies as a 'responsible person' within the meaning of § 6672." (quoting *Rem*, 38 F.3d at 642)). Given the usual law firm hierarchy and the realities of law firm management practices, the Court would be hard-pressed to find a circumstance where one of three shareholders in a small law firm would be a responsible person under § 6672, while the other two would not. And if none of them were so responsible, § 6672 would become useless.

To review, the Government has demonstrated that the evidence marshaled by Todtman and Spizz is insufficient to foreclose a finding that each was a responsible person under § 6672. Todtman's arguments fail because his own statements, as well as the statements of others and the documentary evidence, confirm his deep-seated control of the firm's finances; Spizz's arguments fail because, even when he was not wielding the full extent of his power to control the firm's finances, he always retained such power.

### 2. The Record Forecloses Todtman and Spizz from Contesting Willfulness

The second element under § 6672 requires a showing of willfulness, i.e., "a responsible person who acts, or fails to act, with a 'reckless disregard of obvious or known risks.'" *Carter*, 717 F. Supp. at 194. In this context, an individual's failure to remit trust fund taxes "need not stem from an 'evil motive or intent to defraud,' but it must amount to more than negligence." *Rem*, 38 F.3d at 643 (internal citation omitted). Thus, "a responsible person act[s] willfully within the meaning of § 6672(a) if he (a) knew of the company's obligation to pay withholding taxes, and (b) knew that company funds were being used for other purposes instead." *Winter*, 196 F.3d at 345 (quoting *Rem*, 38 F.3d at 643)). In other words, "[a] person willfully fails to pay withholding taxes within the meaning of [§] 6672 when he pays other creditors with knowledge that withholding taxes are due." *Hochstein*, 900 F.2d at 548.

The Second Circuit recognizes a "reasonable cause" exception to § 6672 liability that applies where a responsible person harbors a reasonable belief that the taxes were paid. *See Winter*, 196 F.3d at 345. But this exception is

severely limited: "[E]ven if a responsible person did not know contemporaneously of the company's nonpayment of withholding taxes, he or she will be held liable for any nonpayment if, when he or she became aware of the delinquency, the company had liquid assets with which to pay the overdue taxes." *Id.* As part of the greater willfulness analysis, a responsible person bears the burden of proving that the company's assets were encumbered and thus unavailable to pay any outstanding tax liability. *See O'Callaghan*, 943 F. Supp. at 326.

### a. Todtman Willfully Failed to Remit Trust Fund Taxes

During 2009 and 2010, Todtman was aware of the firm's responsibility to pay trust fund taxes and that the firm was paying other creditors before the IRS. *See Winter*, 196 F.3d at 345. Indeed, he admitted during his deposition that he "ha[d] an understanding that the firm was required to make employer tax payments on a quarterly basis[.]" (Todtman Dep. 102:11-14). He also signed the firm's quarterly federal tax returns for the third and fourth quarters of 2009 and the first quarter of 2010.

Despite signing off on these returns, Todtman maintained during his deposition that he was unaware whether the firm had timely and fully paid the trust fund taxes for those quarters. (*See* Todtman Dep. 106:21-107:25). But even taking this as true — and one could be forgiven for any difficulty in so doing — Todtman's purported ignorance on this point amounts to a reckless disregard for the risk that the firm would fail to pay the trust fund taxes, given Todtman's responsibility over the firm's tax payments in conjunction with his

signing-off on the tax forms. *See Carter*, 717 F. Supp. at 194. And had Todtman taken greater care, he would have been on notice of the firm's existing tax delinquencies and thus could have been more vigilant in shoring up the firm's tax payments during subsequent quarters. *See Winter*, 196 F.3d at 345 ("Willful conduct may also include a … failure to investigate … after having notice that withholding taxes have not been remitted to the Government." (first ellipses added) (internal quotation marks and citation omitted)); *Carter*, 717 F. Supp. at 194-95 (holding that failure to examine known fiscal problems such as recordkeeping "constitutes the reckless disregard that meets the willfulness requirement"). Accordingly, Todtman's conduct is willful as a matter of law.

Furthermore, from 2009 until June 2010 — while the trust fund taxes remained in arrears — Todtman signed checks on behalf of the firm in order to disburse funds for payroll, payments to creditors, and tax deposits. (*See* Todtman 56.1 Opp. ¶ 23). Todtman contends that he "did not have the authority during the subject period to determine which checks were written." (Todtman Br. 8). But such authority is not required for a finding of willfulness, and even if it were, as discussed above, Todtman had sufficient authority within the firm to be responsible for the firm's handling of tax collection and payment. Todtman also takes issue with "the Government['s] … stance, that any payment not to the Trust Fund is unlawful, even an ordinary business expenditure if taxes are outstanding." (*Id.*). But courts have long recognized that payments such as wages and other ordinary business expenses, if paid while trust fund taxes remain outstanding, support a finding of willfulness.

*See Hochstein*, 900 F.2d at 548 (collecting cases); *Carter*, 717 F. Supp. at 194 (same).

Therefore, the record negates any claim by Todtman that he did not willfully withhold trust fund taxes for the relevant periods of 2009 and 2010, and, having defeated both elements of his claim, the Government is entitled to summary judgment in its favor.

### b.    Spizz Willfully Failed to Remit Trust Fund Taxes

The analysis of Spizz's conduct proceeds in a slightly different manner. Because Spizz learned of his firm's tax delinquencies no later than June 10, 2010, the Court shall bifurcate its analysis of his mental state, first analyzing this element for the tax periods before June 2010, and then applying the same inquiry to the tax periods after that time. Although the record supports a finding of willfulness both before and after June 2010, as explained below, these conclusions follow from distinct theories.

### i.    Pre-June 2010 Tax Periods

As stated above, a responsible person with a reasonable belief that a company is current on its tax payments may nonetheless be liable for tax delinquencies if, when the person learned of the delinquencies, the company had unencumbered assets that the person failed to apply toward the delinquencies. *See Winter*, 196 F.3d at 345. For the tax periods before June 2010, although Spizz may have had a reasonable belief that the firm was current in remitting trust fund taxes, he cannot establish on this record (or,

again, raise a genuine dispute of material fact) that the firm lacked unencumbered assets to pay off the existing tax liability.

Spizz testified that he first learned of the firm's 2009 and 2010 tax delinquencies on June 10, 2010 (Spizz Dep. 86:4-22), and the Government presents no evidence to rebut this contention (*see* Gov't 56.1 ¶ 44 ("No later than June 10, 2010, Spizz learned that [the firm] had not been remitting trust fund taxes to the IRS since June 2009.")).  Nor does the Government present any evidence of financial activity at the firm that would have put Spizz on notice of outstanding tax liabilities at an earlier time.  Spizz thus presents sufficient evidence to establish his reasonable belief that the trust fund taxes were current before June 2010.  Given this reasonable belief, the Court must determine whether, at that time, the firm had unencumbered assets available to pay down the outstanding tax liability, in which case Spizz's failure to apply those assets toward the trust fund taxes would constitute willfulness.  *See Winter*, 196 F.3d at 345.  The Court answers this inquiry in the affirmative.

The Second Circuit has not settled on a definition of "unencumbered assets" in this setting.  But, as the most recent circuit to consider this issue in detail has observed, "[e]very other circuit to have addressed the issue has established a narrow rule that only a legal prohibition on the expenditure of funds renders the assets encumbered." *Nakano* v. *United States*, 742 F.3d 1208, 1211-12 (9th Cir. 2014); *accord Schiffmann* v. *United States*, 811 F.3d 519, 527 (1st Cir. 2016).  For purposes of this motion, this Court adopts the standard proffered by those Circuits to have addressed the issue.

In support of his claim of encumbrance, Spizz presents evidence to suggest that as of June 2010, (i) Sterling National Bank held a lien against all of the firm's assets and (ii) the firm's operating account carried a negative balance of over $20,000. (Spizz 56.1 Opp. ¶¶ 77, 79). Considering first the former, this Court notes that the Second Circuit has not opined as to the degree to which a lien can be considered an encumbrance. However, the Sixth Circuit — the Court of Appeals to have addressed this issue most directly — has recognized that, even under a broader definition of "encumbered assets" that it ultimately declined to follow, "[t]he existence of a superior lien, without more, does not create an encumbrance for purposes of § 6672[ ], [as] there must be conditions imposed by the lender which render the funds unavailable for payment to the IRS of the trust fund taxes for the time period in question." *Bell* v. *United States*, 355 F.3d 387, 395 n.7 (6th Cir. 2004) (alterations in original) (quoting *In re Premo*, 116 B.R. 515, 535 n.34 (Bankr. E.D. Mich. 1990)). Spizz presents no evidence that the lien here carried such conditions. The lien therefore does not render the firm's assets encumbered.

As to the firm's supposed negative operating account balance, the bank statement from June 10, 2010, the date on which Spizz learned of the tax deficiency, establishes only that the firm arrived at a negative balance after disbursing over $80,000 on that date. Although the account's ending balance on June 10, 2010, was overdrawn by $20,314.16, the beginning balance on June 10 was $63,762.83. (Operating Account June 2010). Indeed, the largest deduction from the firm's operating account on that date was a transfer to

another one of the firm's accounts in the amount of $79,117.70, which funds the firm then debited toward payroll. (*See id.*; Payroll Account June 2010). The record thus establishes not only that, on the date that Spizz became aware of the tax liability, the firm had funds available to pay trust fund taxes, but also that the firm diverted those funds to other creditors. The record thus negates Spizz's claim that the firm lacked unencumbered funds, and, by extension, his claim that he did not willfully fail to remit trust fund taxes accruing before June 10, 2010. *Cf. O'Callaghan*, 943 F. Supp. at 326-27 (Plaintiff's admission that company "had at least $17,500 in assets that could have been used to reduce its tax liability" that were used "to run the business rather than pay the Government constitutes willfulness.").

### ii.  Post-June 2010 Tax Periods

Spizz contends that after June 2010, while Nachamie was overseeing the firm's finances, he (Spizz) "reasonably believed that the payroll taxes were being paid." (Spizz Br. 16). But courts have found willfulness where a responsible person fails to assure that a company timely remits trust fund taxes after having notice of previous tax delinquencies. *See Winter*, 196 F.3d at 345. Thus, after Spizz became aware of the firm's tax liabilities in June 2010, he could no longer maintain a reasonable belief that other members of the firm would timely remit trust fund taxes. To the contrary, "these problems gave rise to the duty to follow up and see that the taxes were paid," and Spizz's "[f]ailure to do so constitutes the reckless disregard that meets the willfulness requirement." *Carter*, 717 F. Supp. at 194 (citations omitted). Therefore, the

record negates Spizz's claim that he did not willfully withhold trust fund taxes for the relevant periods both before and after June 10, 2010.  Having defeated both elements of Spizz's claim, the Government is entitled to judgment as a matter of law on its counterclaim against him.[10]

## CONCLUSION

Given the foregoing, the Government's motion for summary judgment is GRANTED.  Spizz and Todtman are jointly and severally liable for the amount due for 2009 and 2010, totaling $698,893.31.  *See Beeler*, 894 F. Supp. at 770 ("[R]esponsible persons are to be held jointly and severally liable for the amount of any one hundred percent penalty."  (citing *Sinder* v. *United States*, 655 F.2d 729, 732 (6th Cir. 1981); *Brown* v. *United States,* 591 F.2d 1136, 1142 (5th Cir.

---

[10]    Spizz spends much of his brief arguing under *Slodov* v. *United States*, 436 U.S. 238 (1978), that "because he was not a 'responsible person' during the quarters in which the tax delinquencies accrued," he is not liable for "pay[ing] other creditors with … revenues" acquired after he became aware of the firm's tax delinquencies.  (Spizz Br. 19).  This reliance, however, is misplaced.

In *Slodov*, the Supreme Court considered whether an individual could be liable for a company's delinquent trust fund taxes under § 6672, where (i) the company's delinquency had accrued before the individual acquired the company and (ii) the individual used the company's assets to pay creditors aside from the IRS after acquiring the company.  *See* 436 U.S. at 240-41.  The Court held in the individual's favor, stating that "§ 7501 does not impress a trust on after-acquired funds," *i.e.*, funds acquired after the individual's acquisition of the company.  *Id.* at 259.  Therefore the individual

> does not violate § 6672 by willfully using employer funds for purposes other than satisfaction of the trust-fund tax claims of the United States *when at the time he assumed control there were no funds with which to satisfy the tax obligation* and the funds thereafter generated are not directly traceable to collected taxes referred to by that statute.

*Id.* at 259-60 (emphasis added).

*Slodov* is inapposite for at least two reasons.  First, as discussed above and in contrast to the facts of *Slodov*, Spizz was responsible for the firm's tax collection and remittance for the entire relevant period.  And second, even assuming Spizz became responsible only after June 10, 2010, when he discovered the tax liability and became more involved in the firm's finances, the firm had funds available at that time to put toward the tax debt, but failed to do so.

1979))).  Spizz is liable for the amount due for 2011 and 2012, totaling $582,213.09.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      December 4, 2017
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge